Case 3090271 Mark Bond v. Helen May it please the Court, Christo Scotch on behalf of Mark Bond, Helen in this matter. The case comes before this Honorable Court on a request that the Commission be reversed on the issue of accidental occurrence, causal connection, TTD, and medical. The main issue before this Court Tribunal is whether an accident did or did not occur on that date. That is the real question that was in controversy at trial. The employer did not obtain any medical testimony on the issue of causation, but disputed the claim on the basis of whether or not an accident had occurred on July 23rd. The Commission in making its ruling in this matter stated that the worker did not meet his burden of proof. There was no specific finding by this Commission. While there is regard or the employer that the petitioner's testimony was not credible or that his lack of credibility was the basis for finding that an accident didn't occur, the Commission did not conclude that no accident occurred because the worker was trying to avoid being transferred onto the line. As stated previously, the Commission concluded at the end of its seven-paragraph statement that Mr. Bond did meet his burden of proof, and then the Commission outlined a number of reasons why. And I understand that the manifest way to the evidence is a very difficult burden to meet. Don't come before this Court lightly in that regard in many cases. But in this case, I think that the reasoning as set forth by the Commission and the facts of this case warrant consideration of Mr. Bond's review. All right. So you've got some ostensible inconsistencies in the claimant's testimony, which you can put, you know, an argument at or spin either way. You also have the testimony of a, I believe this is a J. Ralph supervisor who the Commission looked at. He testified that after the incident, the painful incident, they didn't notice anything unusual about the claimant's demeanor or appearance. So is there no evidence in the record to support the Commission's decision? Well, I believe there isn't. And as I go through the reasoning behind it, I think they had some either wild speculation, incorrect assessment of the law, or things that aren't even supported on the record. But in specific reference to what you're talking about, Your Honor, Mr. Bond, when he testified, was asked about his demeanor and was there any evidence that he talked to his supervisor about his injury. And Mr. Bond's testimony was that Mr. Ralph was in the near vicinity and he had talked to him. He didn't know that there would have been anything other than I hurt my back. The petitioner's testimony, injured worker's testimony, is that when he got to the medical department, that's when he was sopping wet in the excruciating pain, wanting to see the doctor. Mr. Bond never said that he had those types of manifestations at the accident scene. So I think that's one of the arguments I had that was coming later where the Commission made that conclusion stating that's what Mr. Ralph testified to. I'd agree, that's what Mr. Ralph testified to, but Mr. Bond never said that he had those types of manifestations at the scene. So you're saying that the Commission then sort of misinterpreted the evidence. Correct. You know, and in that regard, I want to start off with the first conclusion of the Commission, that the petitioner had a preexisting condition and had an MRI in 2001. I don't know what basis in the law there is for that to have any effect on whether an accident occurred or not. Clearly, preexisting conditions are compensable. It was six years prior to this incident. The same doctor that treated him in 2001 treated him in 2007. We're not dealing with someone that had back and leg pain two weeks before this occurred, two days before this occurred. It was six years earlier. So this isn't a misrepresentation or misinterpretation of the evidence. This is just an incorrect statement of what the law is. It should have nothing to do with whether or not an accident occurred. I don't see the relevant basis for that. Another statement... Did they tie it into the reason for denying the compensation, or did they just note that there was a preexisting condition? No, I think they tie it in there because in paragraph 6, it said, based upon the foregoing, the arbitrator concludes that the petitioner did not sustain his burden of establishing – there's a missing word, but I'm assuming it's an accidental occurrence – in the very first statement that was made by the commission dealt with whether the fact that he had a preexisting condition from six years earlier. So obviously that must have been something that the commission relied upon in coming to that conclusion, or why would that be in that portion of the conclusions of law? It appears to me that the arbitrator spent a considerable number of paragraphs talking about the failure of the petitioner to prove anything or that he wasn't believable. Is that right? Well, the commission hints at Mr. Bond not being believable. There's not an affirmative statement by the arbitrator in that regard. Well, why don't you tell me what the commission said about Dr. Miller and what the claimant said with respect to Dr. Miller. Well, for example, the commission in this case said it's puzzling given that he did not seek outside medical treatment until August 6th, would have been two weeks after the accident. Well, the testimony of Mr. Bond was that he went to the CAT medical department. The doctor wouldn't see him there. He went home. He called Dr. Miller's office. That day, Dr. Miller prescribed Vicodin, said do some therapy exercises. If it doesn't get better, come back and see me. That's exactly what he did. That's documented in Dr. Miller's note of July 23rd. Then there's some statements that the employer argues in the letter to Dr. Miller about was he not allowed to fill out any forms. Well, they're taking your license again with the record and not stating what the actual testimony and evidence is, even taking their witness's testimony. Mr. Bond stated in his letter to Dr. Miller that was written by his wife that he filled out the accident report, but that he wasn't given workers' compensation papers. He never disputed that fact. There's a difference. They get a sheet at Caterpillar for workers' compensation. He never denied that he didn't fill out this work accident report. He testified that he did that. In the letter to Dr. Miller, he said he filled that out, but he didn't get workers' compensation papers. The employer in their brief says, well, Mr. Bond wrote to his doctor and said he wasn't allowed to fill out any papers, and that's not true. He filled out this accident report. Well, that's not what happened in this case. That's what the commission found. That's what they're arguing, but if you actually read the letter itself, that's not what it says. It says he filled out the accident report, but was not given the compensation papers or allowed to see the doctor. Why did he write that letter? He got hassled at the CAP medical department that day. He had a previous problem years ago where a wrong box was checked, and so he put in there, believing that it was work-related, when you fill this form out, check that. Dr. Miller testified, and what did he say? He's made up his own independent mind or judgment in that regard. So I don't see how that letter is germane to whether or not he injured his back that day lifting any type of box. Another argument that was made by the commission and the respondent is the failure of Mr. McClure to testify because he was listed as a witness on the accident report, and the why Danny McClure did not testify at the proceedings. First thing is, nobody knows why. There's no evidence in the record why he didn't testify. Was he sick, afraid of losing his job? Did the claimant know? Who knows? There's no evidence in the record. So we could speculate from now until the end of time. But this witness is on that accident report not just to help Mr. Bond, but to help the employer, because it allowed them to investigate these accidents. The employer had access to Mr. McClure every day from July 23rd, 2007, until this hearing to go talk to him. Better access than I have. Well, here's the thing, though. If you look at that remark I submit in its context and viewed in its entirety, I think you can make the argument that the arbitrator was merely commenting on the claimant's failure to explain an inconsistency. The box is checked. Okay? He doesn't show up. I mean, in and of itself, there seems to be some inconsistency, which I think arguably could be weighed on the credibility of the claimant, could it not? But I think it's asking this Court to make an inference adverse as to why that person is not there without any explanation or basis. Actually, what I think the arbitrator is saying is you check the box that said that Mr. McClure was a witness, then you testified in the stand that there wasn't a witness, and then when you examined the, shown the report, then oh, yes, there was a witness, Mr. McClure, and everybody wants to know where is he? Now, and I, and some of the questioning regarding Mr. McClure in that ground, in that regard I think is fair in terms of, you're correct, he was asked about this witness, and then he was shown the document, and then recalled Mr. McClure. That could go to his memory, his recall, those types of issues. But the statement that I'm focusing on about the adverse inference is the second part, and it says why Mr. McClure did not testify at the proceedings. That doesn't go to, to me, that doesn't go to his memory or inconsistent testimony. There, the commission is making an affirmative statement that, well, he's listed as a witness on there. If he was favorable to Mr. Bond on this accident dispute, he would have testified today. Well, he didn't say anything. Coleman didn't say anything. He wasn't available. I don't know why. He's not here. He said nothing. He doesn't have to, because he's equally available to both sides. And that's why you couldn't even convince Molly Mason, as a commissioner, to rule otherwise. But how can the court make an inference that Mr. McClure's testimony would have been unfavorable? Isn't that what they're arguing here? He wasn't called to testify because he wasn't going to support Mr. Bond. And then you're asking to make that inference, well, because his testimony wasn't going to be favorable. He wasn't going to support his co-worker. That's the purpose of that type of statement there. And you can't do that. I can make the same argument. Why didn't the employer call him to testify? Is that the tipping point in this case? Can't the commission's decision, isn't there sufficient evidence in the record to support it, even if you ignore that alleged admission? What evidence is there that the occurrence didn't happen? Well, again, not to bring it back to the Monday level, as Presiding Justice points out, I mean, you have dozens of credibility. Aren't they uniquely, under the law, within the province of the commission? Can't they choose to believe or not believe witnesses in a decision turned on those factors? Right, but is it a credibility decision in the end by the commission here? I don't think that's clear. They say J. Ralph is credible. There is no affirmative statement that Mr. I mean, you look at, he says he lifted the boxes. His back hurts. He has left leg pain. An MRI is done a month later that corroborates those symptoms exactly. Now, the arbitrator didn't say, you know what, it's due to all these, you know, this letter and this, that this accident didn't happen. We don't have that type of affirmative statement. She said he didn't meet his burden of proof. That was the conclusion. The commission's decision, does that delineate specific enough findings? Is that part of the argument? That is part of the argument, because how do we know what their mind? So then I look at their, how are they coming about with this decision, and when they have things that are completely inaccurate about when he first sought treatment, the move letter, when actually he's been trying to get out of there for months, if not a year, when they cite the preexisting conditions being a factor that an accident occurred, and then there's no specific reasoning from the commission as to why this accident case was denied, I think there is a significant question in that regard. And that's kind of the reason for making this argument and coming before this tribunal. It's not one factor in itself, but it's a combination of all these things that I believe supports Mr. Bond's grounds for appeal. Thank you. Thank you. Counsel, please. If I may please the court, counsel. My name is Mark Peters, and I represent the respondent, Appali Caterpillar Incorporated, in this case. I believe this case can be summed up in one sentence or one thought rather briefly. Mark Bond, the petitioner appellant in this case, was not a credible witness, and his testimony was not supported by the evidence. I went in great detail in my brief as to why I believe this is the case, and I'll make a few points on the credibility issues, but I won't belabor it. Counsel, before you do that, let me just interject. What do you make of opposing counsel's argument that there's a lack of specificity in the commission's decision relative to the basis of its finding? I disagree with that. If his point is that the arbitrator didn't specifically the arbitrator, which the commission adopted the arbitrator's decision, didn't specifically find that the petitioner appellant was not credible, one, I don't think that's necessary. Two, there was specifics. I'd rather see in an arbitrator or commission's decision the specifics as opposed to that conclusion. And third, the arbitrator specifically and the commission specifically found Jay Ralph, the supervisor, credible. And I think when you look at those two sets of testimony, which are the factual evidence in the case, I believe it is impossible to reconcile those to say Jay Ralph's testimony is credible and Mark Bond's testimony is credible. One brief example just as to that, and I think there's many, but the most critical one, on the date of the alleged accident, the accident was alleged to have occurred at 635. The work shift started at 630. So this is five minutes into Mr. Bond's shift. There's a five to ten minute meeting held thereafter. Mark Bond approaches Jay Ralph, and the first words out of his mouth, according to Jay Ralph, of course not according to Mark Bond, is, am I going to be moved? And then when Mr. Ralph confirms that, he is going to be moved and he's going to be moved to the Mossville line, which I assert the evidence shows is not where Mr. Bond wanted to go, then for the first time that day, Mr. Bond states, I hurt my back. That is in direct contradiction to Mr. Bond. So if we believe Mr. Ralph, which the commission did and those cannot be reconciled, and I believe that would be contrary to the Lee case and in effect re-weighing the evidence, going backwards in time and saying the petitioner is credible or more credible than Mr. Ralph, and therefore I think the arbitrator's findings provide plenty of detail in this case. Just again, and I'm not going to go through all this. I've documented it. I'll certainly go into it farther if the court wants to go into it. Let's address the outward appearance of the petitioner shortly after the accident. In petitioner's appellant's brief and argument, there was much about this that Mr. Ralph can't tell, because he's not a medical professional, that the petitioner is in pain. That you have to be a physician or somebody in the medical community. The court has probably reviewed the petitioner's letter to Dr. Miller, and in the first paragraph of that letter, he talks about the very moment where he allegedly injured his back, and he discusses how a the accident report, he states, and I'm paraphrasing, but it's something to the effect the coworker noticed that he was in great pain. So on one hand, the petitioner appellant's attorney is arguing J. Ralph's testimony that there were no outward signs of pain, such as sweating, which the petitioner said he did, that he was hobbling. In the letter, he says he was hobbling to first aid, not after he got to first aid, to first aid. So from where he had this discussion with Mr. Ralph shortly after the alleged accident, he's hobbling, and he said, I couldn't stand up. This is not at first aid. This is shortly after the accident. And why somebody has to have a altered, they were not sweating, there was nothing unusual about his demeanor. He did not render any medical opinions, but somehow Mr. Bond's coworker is in some sort of heightened position that that person can, if you're to believe the petitioner's testimony, excuse me, the petitioner's letter to Dr. Miller, which I'm not suggesting you did, but I am suggesting it creates an inherent contradiction. Medical condition. The main reason, in my opinion, the arbitrator brought up the medical condition is not so much that this is a causal connection defense, but because it's an accident. And I think to discuss the accident, inherent in that discussion is you have to discuss the physical condition of the petitioner before and after the alleged accident. The MRI that the petitioner appellant put so much stock in is actually the best piece of evidence to suggest that the petitioner's condition did not change. In 2001, the petitioner appellant had problems with his back, sought treatment from Dr. Miller, underwent an MRI, and then a few months after the alleged accident in 2008, the petitioner appellant underwent a second MRI. The family physician, Dr. Miller, testified under oath, and I'm quoting, that those MRIs, when compared, were essentially the same. The other portion of the petitioner appellant's brief that he suggests that the MRI corroborates his symptoms because he has a radicular pattern going down his left extremity. What should be noted is in 2001, the MRI did not change. So, in fact, the very medical points that petitioner appellant counsels suggest support this claim, in fact, support the respondent's claim that there was, other than the subjective complaints, and that's all we have here is subjective complaints, there is absolutely no support whatsoever for any change in condition. With regard to this letter from the petitioner appellant, I think that this is common practice in the work comp industry, and I don't suggest in any way that I have remotely as much collective work comp experiences as the justice who's here, but in the years that I've practiced work comp, I have never, ever seen a letter from an employee to his doctor two weeks, approximately 10 days before he's even examined by the doctor. And one should perhaps, I suggest, inquire as to why would a person send such a letter. The pretext for the letter, if you recall, was well, he had problems with this in the past based on a disability form that was not completed correctly, but once again, Mr. Bond was directly contradicted on this issue. Specifically, Mr. Bond said, well, some doctor in the past that we don't know, and this piece of paper suggested that a disability form was completed incorrectly, but what is interesting is that Dr. Miller, when asked about Dr. Miller, he said, well, Dr. Miller's never completed any form like that, but that's not true. In Caterpillar exhibits, we found an old disability form for 2001, which normally would be of no significance at all, but on this specific issue, I believe it's very relevant in that Dr. Miller completed a form seven years earlier, and he marked the box that says it was work-related. So Mr. Bond's pretext for filling that out is simply inaccurate. What really the reason for this is, is he obviously knew that Caterpillar, based on his rather bizarre recount of the accident, was going to question that this is work-related, so he specifically asked the doctor, mark the work- related, and he also wanted him to mark that he should either not work or not have restrictions, which would go back, again, to his agenda or his goal that he doesn't want to work on the Mossville line, he'd rather work in the epicenter, or, and perhaps sit and wait for the East Peoria job that pays more money than either jobs and is less physically demanding than the Mossville line. We can only speculate. Was the decision of the commission against the manifest weight of the evidence? It is not. Just a couple points on this Danny McClure issue, which I suggest is a red herring for several reasons. Just briefly, and I believe the court laid out well the lack of testimony, but the accident report, or incident report, which is a Caterpillar incident report, was completed by Mr. Bond and specifically listed Mr. McClure as a witness to the accident. And then again, the July 27, 2007 letter to Dr. Miller, and I'm quoting from that letter, another coworker was standing right beside me and I knew I was in a lot of pain. There were no other coworkers listed on the incident report other than Danny McClure. So I'm assuming that maybe he's making a reference to Danny McClure. We'll never know because he never clarified that at arbitration. So the point of this is, Mr. Bond is injecting Danny McClure into this case. This is not a situation where I suggest that IPI 5.01, I suggest the scenario that Mr. McClure was involved in, that he was involved in, would accompany a 5.01 instruction is the auto accident where one of the cars is alleged to have run a red light and we have a third party witness that's interviewed by a police officer and renders an opinion one way or another as the color of the light, whether it's a red light or a green light, and neither party calls that third party witness. And one of the parties comes in and in a closing argument in a jury trial states, well, they didn't even call this witness. Why did they call the witness? They must have knew the testimony was bad. That would be an example of where making a 5.01 argument, IPI 5.01 argument, would be appropriate. This is not the case. And further, I suggest that there's a question as to whether there's any actual adverse inference. Because if there's no adverse inference, we don't even get to 5.01. There were no... I don't think one was necessarily drunk, was it? Pardon? I don't think an adverse inference was drunk. I think from the context, the arbitrator is pointing out sort of a credibility problem, an inconsistency. So I don't believe... That's my argument. I mean, that was the very argument I was going to make. There was no objection made to the testimony. And, again, the arbitrator's findings was simply a summary of the testimony relating to Danny McClure. I don't think there's any adverse inference. And pursuant to the Ellington case, the court found that if there's no objection, and that case was a closing argument, so I realize it's distinguishable for that reason. If there's no objection, that party cannot sit on its hands and say, not object, and then later suggest that that was inappropriate evidence, or in this case, inappropriate evidence, or in that case, an inappropriate argument. So in sum, I believe that there's that... And I think there's also a question with regard to applying this pattern jury instruction. There's no cases that I could find that suggest, first of all, that we need to be going through this analysis as to whether a pattern jury instruction applies in a workers' compensation case. There's no case law on that. Further, the only issues in dispute under 5.01 are 2 and 3, the second element of 2 and 3 I've already addressed. And I believe that there's a question based on the Spenard case as to whether a... Whether the witness was truly unavailable. And, again, that goes back to the Spenard case as opposed to being some third-party objective witness. Your time is up, counsel. Thank you. Mr. Vettel. Briefly, Your Honor, just to address one issue. The briefs of the employer and some of the questions here interject an opinion onto this case, that there is no finding that the reason the accident was denied in this case was that Mr. Bond was not credible. Can't have it both ways. What? Either the supervisor was credible or he was credible, but they're not both. I mean, there's no other way to read it. These people just didn't believe him, including Commissioner Mason. They just didn't believe him. He was an unbelievable witness. And so they ruled against him. That's all it is. Well, I understand that. I mean, there has to be a ruling or a finding somehow that this didn't occur, because if it did occur, it has to be a case. They found that there was no accident that arose out of it in the course of the appointment. That's what they found. All right, counsel, let me ask you this. The fact that, arguably, you're saying the commission did not delineate specific factual findings on the credibility issue, does that somehow automatically, as a matter of law, mandate a reversal? No, but then it puts me back to this point I was making earlier. Then you have to go back and say, all right, we look at how they came about with the conclusion. And then I go back through these various points, and it's very irritating to have things and decisions from commissions like he didn't seek treatment until August 6th. Not true. He said he had sopping wet when he talked to Ralph, J. Ralph, at the scene. Not true. He had a preexisting condition. He represented that he was in pain immediately, though. He represented he was in pain, but on page He sat through a meeting of five or seven minutes without complaining to anyone. He didn't testify that he sat through that meeting. No, who did? Ralph did. Who did they find credible? That's true, Your Honor, but I will say this in the testimony, was your walk or your gait affected when you approached Mr. Ralph? It was a small area. I might have been standing there and just move over to J., say like to that wall, to say something like to J., you know, I hurt my back, I was going to first aid. That was the actual testimony in the case. Not what they've argued, that he said he was sopping wet at the scene and hobbled over to him. It was on the way to first aid in this large plant, and then when he got to the medical department. So what I'm looking at is, I understand the argument that he's not, I believe, I understand the argument here, but my whole point is if they don't make that finding, then I have to look at what has the commission done in this decision, how did they come up with that conclusion when we go backwards through this to look if it's against the manifest way. And I look through the six things that they point to. Could have been simple. Wouldn't have been here. Make that finding and say, you know what, the guy wasn't credible. I don't believe an accident occurred because of these inconsistencies. But that's not there. They cite these other reasons and never make the final leap or conclusion. Thank you. Thank you, counsel. The court will take the matter under advisement for disposition.